UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 07-60149-CR-COHN/SNOW

UNITED STATES OF AMERICA

    Plaintiff,

vs.

RICKY JACKSON,

    Defendant.
_____/



## REPORT AND RECOMMENDATION

THIS CAUSE is before the Court on the defendant's Motion to Suppress (DE 27), which was referred to United States Magistrate Judge Lurana S. Snow. The defendant is charged with possessing a firearm and ammunition as a convicted felon, in violation of 18 U.S.C. §§ 922(g)(1) and 924(c). He seeks to suppress statements made and evidence seized on April 3, 2007, the date of his arrest on state charges; statements made to a federal agent on June 1, 2007, and statements and evidence taken on June 21, 2007, the date of his arrest on the instant indictment. An evidentiary hearing was held on this motion on August 30, 2007.

### I. FACTS PRESENTED

Fort Lauderdale Police Officer Aaron Burk testified that he was working the midnight shift as a patrol officer on April 3, 2007. At approximately 1:15 a.m., Officer Burk responded to a 911 report that a black male was firing a gun outside a residence. The caller, who was female, stated that the shooter was wearing gray pants.

When Officer Burk arrived at the address that had been provided by the caller, he was waved over by the defendant, who was wearing gray pants and a black shirt. Officer Burk arrived alone, but was joined by his partner within minutes. Officer Burk told the defendant he had received a complaint about someone shooting a firearm. The defendant stated that he had fired shots into the air with a .38 caliber weapon in order to scare his neighbor. The defendant explained that the neighbor, a female, had sprayed him with pepper spray on a prior occasion.

Officer Burk asked the defendant where the gun was. The defendant responded that his cousin had taken the gun away. Officer Burk then placed the defendant in handcuffs of advised him of his <u>Miranda</u> rights. After each right was read, the defendant stated that he understood. After all of the warnings were administered, the defendant agreed to waive his rights and speak to the officer.

Officer Burk noted that one of the doors to the defendant's residence was open. He asked the defendant if he could check inside the house for injured people. The defendant replied that the officer needed a warrant to search his home. When Officer Burk asked again about searching for injured people, the defendant reiterated that the officer could not search without a warrant. Finally, when Officer Burk assured the defendant that he would not be searching for anything other than injured people, the defendant agreed to accompany the officer inside the house.

2

During the sweep of the house, Officer Burk entered a room which the defendant identified as his bedroom. The officer observed a black pistol grip protruding about four inches from under a sheet on the bed. Officer Burk asked the defendant about the gun, and the defendant stated that it was his shotgun for his protection. At that point, Officer Burk took the defendant outside and left the defendant with his partner. Officer Burk returned to the bedroom a photographed the gun as he had found it on the bed. Officer Burk then took the shotgun, together with one spent shell and four live shells, and placed them in the trunk of his patrol car. He did not conduct any further search of the house.

Officer Burk conducted a record check of the defendant and learned that the defendant was a convicted felon. He contacted Fort Lauderdale Police Detective William DeJesus, and transported the defendant to the police station. Prior to leaving the defendant's residence, Officer Burk found a spent shotgun shell on the defendant's property.

On cross examination, Officer Burk acknowledged that the defendant told he had fired shots in the air, not inside his home. Nevertheless, Officer Burk thought there might be someone inside. Officer Burk stated that when he and the defendant went into the house, the defendant was anxious to prove to the officer that there were no injured people and no .38 firearm inside. Officer Burk denied going into the house alone, and stated that his partner did not go inside at any time. Officer Burk also denied moving the

3

sheet before photographing the shotgun that he found in the defendant's bedroom.

Detective William DeJesus testified that he first encountered the defendant at the police station on April 3, 2007. He noticed the defendant because the defendant was making loud comments about his rights having been violated. When Detective DeJesus asked the defendant how this had happened, the defendant replied that he had given the officer permission to search his house for a .38, not for a shotgun. Detective DeJesus explained to the defendant about the "plain view" doctrine, and the defendant became somewhat calmer.

On cross, Detective DeJesus conceded that he had initiated the conversation with the defendant, but added that he had done so in response to the defendant's comments. Detective DeJesus stated that he was trying to calm down the defendant so that the booking process could be completed.

ATF Special Agent Jennifer Devito testified that she began a federal investigation of the defendant after being contacted by Officer Burk. On June 1, 2007, while she was conducting a canvas of the defendant's neighborhood, the defendant approached her. Agent Devito asked the defendant if he was Ricky Jackson, and the defendant replied that he was. Agent Devito then identified herself and told the defendant she was in the neighborhood to find out if there were any witnesses to the shooting that had occurred in his back yard. The defendant

responded, "You mean when I was shooting in my back yard?" Agent Devito said, "yes," and asked the defendant if he would be willing to answer questions. The defendant replied that he would answer anything she wanted. The defendant was not in custody at the time.

The defendant told Agent Devito that on the evening of the shooting, there had been people loitering around his house. The defendant explained that this had been a continuing problem. The defendant said that he fired his shotgun into the air with the intent of drawing the police and causing the loiterers to go away. The defendant then went inside and hid the shotgun in his bed.

The defendant went on to state that when Officer Burk arrived, the officer wanted to look inside the house for injured people. The defendant initially told the officer he could not go in without a warrant, but ultimately the defendant agreed to walk through the house with the officer. The defendant told Agent Devito that he believed that he had covered the shotgun completely with the bedspread. He also told the agent that he had purchased the shotgun for $100 from a man who lived down the street from the defendant.

Agent Devito testified that she did not go to the neighborhood with the intention of questioning the defendant. She added that the defendant had been very cooperative and was anxious to explain why he had been shooting into the air on the night of his arrest.

Agent Devito next saw the defendant on June 21, 2007, the

5

date of his arrest for the charge set forth in the instant indictment. In an ATF interview room, Agent Devito read the defendant his <u>Miranda</u> rights from an advice of rights form. The defendant signed the form, and his signature was witnessed by Agent Devito and ATF Special Agent Finch. Agent Devito recalled that the defendant was calm and very cooperative. He was offered the opportunity to use the rest room and was given something to drink.

After waiving his rights, the defendant related the same information he had provided on June 1, but provided more details. The defendant admitted to the agents that he did not own a .38 firearm and that his cousin had not been anywhere near the defendant's home on the night in question. The defendant conceded that he had made up that story for the benefit of Officer Burk. The defendant reiterated that he believed the police should have had a search warrant before entering his house on April 3, 2007. However, the defendant conceded that when he went through the house with Officer Burk, he saw that part of the shotgun was visible.

The defendant stated that he had not racked the shotgun a second time, so there should have been a spent shell inside. He told the agents that he had purchased the ammunition for the shotgun at a place called "Guns and Knives," and that there were still two boxes of ammunition inside his house. The defendant gave written consent to a search of his home, and agents found the two boxes of ammunition in the location the defendant had described.

On cross examination, Agent Devito acknowledged that it had not occurred to her while speaking to the defendant on June 1, 2007, that the defendant might have been represented by counsel in connection with the state case. She did think about this after leaving the defendant, and went back to ask him whether he had a lawyer.

Agent Devito also conceded that the defendant had told her that he thought one of the officers might have gone inside the house and moved the sheet that had been covering the shotgun. Agent Devito questioned the two officers, who told her that only Officer Burk had gone inside and that the defendant had accompanied him.

Finally, Agent Devito testified that on June 21, 2007, she read the defendant his <u>Miranda</u> rights, but did not ask him whether he had a lawyer. The parties stipulated that a state public defender was appointed to represent the defendant on May 15, 2007, and that the state charges were not dismissed until after the defendant's arrest on the instant case.

The defendant testified on his own behalf at the suppression hearing. He reiterated the information he had provided to Agent Devito on June 1 and June 21, 2007, with some additions. The defendant stated that the people who had been loitering outside his house were crack dealers. He said that they had woken him up while arguing about whose turn it was to sell.

7

According to the defendant, the first thing Officer Burk did when he arrived on the scene was place the defendant in handcuffs. Officer Burk advised the defendant that he was not under arrest, but because he fit the description of someone who had discharged a firearm, he was being handcuffed for safety reasons. However, the defendant knew that he was not free to leave.

When Officer Burk's partner arrived, he went to speak with the person who had made the 911 call. Officer Burk twice asked the defendant if there was anyone inside the house who was hurt, and told the defendant that he wanted to search. Each time the defendant told the officer that he could not search without a warrant. According to the defendant, Officer Burk said that he was going to have to go in there anyway.

The defendant testified that after about 45 minutes, Officer Burk entered the house alone, and stayed inside for about fifteen minutes. Then Officer Burk and his partner approached the defendant and asked to go into the house. The defendant agreed because so much time had gone by and he felt pressured to go along with the officers. The defendant stated that no one yet had advised him of his rights and that no mention had been made of a .38.

The defendant recalled that he followed Officer Burk's partner inside the house, while Officer Burk, who had the defendant by the shoulders, followed behind. Once inside the house, the three went from room to room until they saw the shotgun. The

defendant stated he was certain that he had completely covered the shotgun with the bedspread before the officers arrived. The defendant surmised that Officer Burke had moved the bedspread while he was alone in the house.

The defendant testified that it was only when Officer Burk took possession of the shotgun that he advised the defendant of his rights. The defendant also stated that after the house had been searched, the officers asked the defendant to sign a written consent to search. According to the defendant, the officers threatened to turn the case over to federal agents if the defendant refused to sign the consent form, but the defendant did not sign the form.

The defendant went to court the following day, and a public defender was appointed to represent him. The defendant testified that he never confronted Officer Burk about going into the house alone, but he did tell Agent Devito about it. The defendant admitted that it was he who had approached the agent, explaining that he wanted to get a closer look at her because she was so pretty. At no time during the conversation did Agent Devito ask the defendant if he had a lawyer or if he wanted to talk to his lawyer, and the agent did not tell the defendant that she was investigating a federal case.

The defendant testified that other than the <u>Miranda</u> warnings, there had been no discussion of a lawyer at the time of the defendant's arrest on federal charges.

In response to questions posed by the Court, the defendant admitted that he knew he could not possess a firearm as a convicted felon, and that this was the reason he hid the shotgun and invented the story that his cousin had taken the gun away.

## II. RECOMMENDATIONS OF LAW

A. <u>April 3, 2007</u>

The defendant first contends that the statements and evidence taken on the date of his state arrest should be suppressed. He argues that one of the officers entered his home without a warrant and uncovered the shotgun, and as a result, the shotgun is inadmissible. Further, since the defendant was not advised of his <u>Miranda</u> rights until after the illegal entry, all statements made to the police must be suppressed. The defendant reasons that statements made prior to the <u>Miranda</u> warnings are inadmissible because the defendant was in custody at the time he was questioned, and that statements made after the warnings were the product of the unlawful search of the defendant's residence.

The undersigned accepts as credible the testimony of Officer Burk that the defendant was advised of his <u>Miranda</u> rights as soon as he was handcuffed and that the only time any police officer entered the defendant's home was when Officer Burk conducted a sweep while accompanied by the defendant. The undersigned also finds credible Officer Burk's statement that the defendant voluntarily agreed to the search of his home for injured people.

The undersigned finds that the defendant's contrary testimony must be rejected as incredible and unworthy of belief. The defendant's statements regarding the timing of the Miranda warnings and the purported search of the house by Officer Burk alone are self-serving attempts to deal with the facts that the defendant made incriminating statements and failed in his efforts to hide the shotgun. Moreover, this testimony conflicts with the defendant's own statements to Detective DeJesus that he had consented only to a search for a .38, not for a shotgun.

The undersigned finds that all statements uttered by the defendant after he was handcuffed (and, therefore, "in custody") on April 3, 2007, were made after the defendant had been advised of his Miranda rights and knowingly waived those rights. The brief statements of the defendant prior to that time were answers to questions posed by the officer in response to a 911 call about shots being fired. These questions were permissible under the "public safety" exception to the Miranda requirements as set forth in New York v. Quarles, 467 U.S. 649 (1984), and discussed by this Circuit in United States v. Newsome, 475 F.3d 1221, 1224-25 (11th Cir. 2007).

Additionally, the defendant voluntarily consented to a search of his residence for injured people and, during the course of that search, the defendant's shotgun was in plain view.[1]

---

[1] Since there had been report that gunshots had been fired and one of the doors to the defendant's house was open, Officer

Accordingly, statements and evidence taken from the defendant on April 3, 2007, are admissible against him at trial.

B. June 1, 2007

The defendant next asserts that the statements he made to Agent Devito on June 1, 2007, were taken in violation of his Sixth Amendment right to counsel, since counsel already had been appointed to represent him on the state case. However, as the Government points out, this right is "offense specific." McNeil v. Wisconsin, 501 U.S. 171, 175 (1991). "It cannot be invoked once for all future prosecutions, for it does not attach until a prosecution is commenced, that is, 'at or after the initiation of criminal proceedings - whether by way of formal charge, preliminary hearing, indictment, information, or arraignment.'" Id., quoting United States v. Gouveia, 467 U.S. 682, 689 (1984). Therefore, in the instant case, the defendant's right to counsel had attached only in connection with the state charge, a different offense than the one being investigated by Agent Devito. Moreover, since the defendant was not in custody and, in fact, had initiated the conversation with Agent Devito, Miranda warnings were not required.

---

Burk had a reasonable concern that someone inside the house might have been wounded. Under these circumstances, the officer was entitled to conduct a sweep of the house to look for injured people regardless of whether the defendant consented to such a search. United States v. Holloway, 290 F.3d 1331 (11th Cir. 2002); United States v. Caraza, 843 F.2d 432 (11th Cir. 1988). During the course of such a sweep, police are entitled to seize incriminating evidence in plain view. United States v. McGough, 412 F. 3d 1232, 1237 (11th Cir. 2005).

12

Accordingly, the statements made by the defendant on June 1, 2007, need not be suppressed.

C. June 21, 2007

The defendant makes the same argument that his Sixth Amendment right to counsel was violated at time of his post-arrest statements on June 21, 2007. As noted above, the defendant was represented by counsel in connection with the state case, not the case on which he had been arrested, and there was no violation of his right to counsel during post-Miranda questioning. Additionally, the defendant voluntarily signed a written consent to search which authorized the seizure of the ammunition from his home. Accordingly, the statements and evidence taken from him on June 21, 2007 are admissible.

III. CONCLUSION

For the foregoing reasons, it is RECOMMENDED that the defendant's Motion to Suppress be DENIED.

DONE AND ORDERED at Fort Lauderdale, Florida, this 4th day of September, 2007.

LURANA S. SNOW
UNITED STATES MAGISTRATE JUDGE

Copies to:

AUSA Joanne Fine
AFPD Patrick Hunt